UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEXTER ANDERSON,

                        Plaintiff,                Civil Action No. 15-11703
                                                Honorable Gershwin A. Drain
v.                                          Magistrate Judge David R. Grand

B. TRUE, ARDETTA MOODY,
MATTHEW BURNETT, and
ANDRE McCLATCHEY,

                        Defendants.
_____/

### REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [46]

Before the Court is a Motion for Summary Judgment filed on June 1, 2016, by Defendants B. True, Ardetta Moody, Matthew Burnett, and Andre McClatchey (collectively "Defendants"), all of whom are employed by the Federal Bureau of Prisons ("BOP"). (Doc. #46). Plaintiff Dexter Anderson ("Anderson"), an incarcerated person,[1] filed a response to Defendants' motion on July 18, 2016 (Doc. #61), and Defendants filed a reply on August 1, 2016 (Doc. #64).

An Order of Reference was entered on May 18, 2015, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. §636(b). (Doc. #6). Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody. *See* E.D. Mich. L.R. 7.1(f). Here, the Court finds that the facts and legal issues are adequately presented in the briefs and on the record, and it declines to order a hearing at this time.

---

[1] In 2004, Anderson was sentenced in the Eastern District of Wisconsin to 300 months' incarceration for Conspiracy to Distribute Cocaine and Possession of a Firearm after a Felony Conviction. (Doc. #46 at Ex. A).

**I.     RECOMMENDATION**

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment [**46**] be **GRANTED**.

**II.    REPORT**

   **A.    Factual Background**

On May 11, 2015, Anderson filed his complaint in this case, suing Defendants in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). (Doc. #1). At the time of the events in question, Defendants worked at the Federal Correctional Institution in Milan, Michigan ("FCI Milan"), where Anderson was housed. Essentially, Anderson alleges that Defendants violated his First Amendment rights by transferring him from FCI Milan to the Federal Correctional Institution in Danbury, Connecticut ("FCI Danbury") – an institution he considers inferior to FCI Milan – in retaliation for filing administrative grievances. (*Id.*).

   *1.    The Relevant Administrative Grievance*

At issue in this case is a grievance[2] filed by Anderson against his then-Unit Manager, Defendant Ardetta Moody ("Moody") on July 2, 2013.[3] (Doc. #7 at Ex. 9). On his Request for

---

[2] The BOP makes available to its inmates a three-level administrative remedy process in the event that informal attempts to resolve issues of conditions of incarceration fail. (Doc. #46 at Ex. C, ¶4). Informal resolution attempts are typically submitted on forms referred to as "BP-8s." (*Id.*). If an inmate is unable to informally resolve the issue, the administrative remedy process is commenced by filing a Request for Administrative Remedy ("Form BP-9") at the institution where the inmate is incarcerated. (*Id.*). If the inmate is not satisfied with the response at that level, he may submit an appeal to the Regional Director ("Form BP-10"). (*Id.*). Finally, if dissatisfied with the Regional Director's response, the inmate may appeal to the General Counsel in the BOP's Central Office in Washington, D.C. ("Form BP-11"). (*Id.*).

[3] Anderson filed numerous other grievances while incarcerated at FCI Milan, including grievances regarding cable television channels, the mailroom supervisor's alleged failure to timely notify inmates of mail rejection, and a policy memo concerning the confiscation of certain inmate commissary photos. (Doc. #46 at Ex. C, Att. 1). Indeed, at the time of the filing of

2

Administrative Remedy ("BP-9"), Anderson alleged that, on June 7, 2013, Moody called him into her office and asked if he was the inmate who had asked her secretary to notarize some court documents. (*Id.*). When Anderson responded affirmatively, and said that Defendant Associate Warden William True ("True") had instructed him to do so, Moody allegedly cut him off, told him he should not have done that, and accused him of trying to "circumvent the system." (*Id.*). Anderson further alleged that Moody then became "disrespectful, rude, and unprofessional," and threatened to send him to the Special Housing Unit. (*Id.*). In his grievance, Anderson also complained that Moody was generally "not approachable" and called inmates "young man" even when she knew their names. (*Id.*). Anderson requested that Moody be demoted from her position as Unit Manager and that the Office of Internal Affairs be notified immediately so that he could be interviewed about Moody. (*Id.*). Anderson expressly stated on his BP-9: "Any retaliation based on the filing of this Staff Misconduct complaint whether directly or indirectly will result in the filing of a Civil Lawsuit against these individuals." (*Id.*).

On August 6, 2013, Associate Warden True, in his role as Acting Warden,[4] provided a formal response to Anderson's BP-9 grievance, explaining that informing Anderson of the notary process, advising him that misconduct could result in placement in the Special Housing Unit, and referring to Anderson and others as "young man" did not constitute staff misconduct by Moody. (*Id.* at Ex. 10). Anderson then filed a Regional Appeal (BP-10), which was denied on September 3, 2013. (Doc. #46 at Ex. C, Att. 1). Anderson did not complete the third and final step of the

---

Defendants' motion for summary judgment, Anderson had filed 34 separate grievances since entering federal custody. (*Id.* at Ex. C, ¶6 and Att. 1). In his amended complaint, however, Anderson asserts that "[c]ircumstances surrounding [his] retaliatory transfer began around June of 2013," when he filed a grievance against Defendant Moody. (Doc. #6 at 9). Thus, the Court will focus its analysis on that grievance and its relation – if any – to Anderson's subsequent transfer to FCI Danbury.

[4] As the Associate Warden, True at times assumed the role of Acting Warden when Warden J.A. Terris was absent from the facility. (Doc. #46 at Ex. G, ¶3).

administrative remedy process with respect to this grievance. (*Id.* at Ex. C, ¶9).

        2.      *The Hazleton Activation Memo*

On January 27, 2014, more than six months after Anderson filed the grievance against Moody, the BOP issued a memo soliciting inmates for activation of FCI Hazleton in West Virginia, which was scheduled to take place in March 2014. (*Id.* at Ex. I). The Hazelton Activation Memo specified that medium or low security prisoners with at least one year clear conduct and a release date on or after March 17, 2016, would be eligible for transfer to Hazleton. (*Id.*). The memo further provided that priority would be given to inmates with good work histories in food service or mechanical services and to inmates with release residences geographically closest to FCI Hazleton. (*Id.*).

In response to this memo, on January 29, 2014, Moody sent an email to Defendant Matthew Burnett ("Burnett"), Anderson's Case Manager, stating that she believed Anderson met the criteria for transfer to FCI Hazleton, and asking Burnett to submit Anderson for transfer. (Doc. #7 at Ex. 13). According to Burnett, he then consulted the SENTRY system (a computerized database of inmate information) to determine whether Anderson met the criteria for transfer to FCI Hazleton. (Doc. #46 at Ex. E, ¶5). In his affidavit, Burnett avers that Anderson did not appear to be a good candidate for transfer to Hazleton because even though he was technically eligible, FCI Hazleton is a medium security level institution and Anderson was a low security inmate. (*Id.*). Burnett then called Moody to explain that Anderson was not a good candidate for transfer to FCI Hazleton. (*Id.*).

        3.      *The Danbury Activation Memo*

On February 25, 2014, the BOP issued another memo, this time soliciting inmates for activation of FCI Danbury in Connecticut, which was scheduled to take place in April 2014. (Doc. #7 at Ex. 14). The Danbury Activation Memo specified that low security prisoners with at

least one year clear conduct and a release date on or after October 15, 2015, would be eligible. (*Id.*). The memo further provided that priority would be given to inmates with work experience in mechanical services and to inmates with release residences geographically close to FCI Danbury. (*Id.*).

In her affidavit, Moody asserts that, in response to this memo, she directed Case Manager Burnett to determine whether Anderson was an appropriate candidate for transfer to FCI Danbury. (Doc. #46 at Ex. D, ¶8). At the same time, Moody directed another Case Manager, K. Henley, to determine whether three other inmates (who were part of Henley's caseload) were eligible for transfer to Danbury. (*Id.*). Subsequently, on April 25, 2014, Moody received a follow-up email from the Associate Warden's secretary, Cynthia Suydam, directing Moody to examine her caseload to see if she had "appropriate inmates to transfer to Danbury" as "Danbury needs inmates and we [FCI Milan] need to free up beds." (*Id.* at Ex. D, Att. 3). As a result, Moody again asked Burnett to see if Anderson was eligible for transfer. (*Id.* at Ex. D, ¶10).

Shortly thereafter, Burnett drafted a Request for Transfer form ("BP-409") to apply for Anderson's transfer to FCI Danbury. (*Id.* at Ex. E, ¶7 and Att. 1). The BP-409 indicated that it was generated to effect a population increase at FCI Danbury, as denoted by Code 318.[5] (*Id.* at Ex. D, ¶12, Ex. E, ¶12, Ex. F). According to Moody, she reviewed and signed BP-409 forms requesting the transfer of Anderson and three other inmates to Danbury. (*Id.* at Ex. D, ¶13). In his affidavit, Associate Warden True avers that he signed off on Anderson's Request for Transfer form because Warden Terris was absent from the facility on the day in question (May 27, 2014). (*Id.* at Ex. F, Ex. G, ¶4). Around the same time, True signed forms requesting the transfer of

---

[5] Code 318 is defined in BOP Program Statement 5100.08 (Inmate Security Designation and Custody Classification) as a "transfer to build a population, usually upon activation of a new facility." (Doc.#46 at Ex. D, ¶12).

5

seven other inmates to FCI Danbury. (Doc. #46 at Ex. G, ¶4). The forms were then transmitted to the Designation and Sentence Computation Center in Grand Prairie, Texas. (*Id.* at Ex. G, ¶7). According to Anderson, he learned of his impending transfer to FCI Danbury on June 19, 2014. (Doc. #7 at 14).

    *4.*  *Anderson Files the Instant Lawsuit*

  On May 11, 2015, Anderson filed his complaint in this case. (Doc. #1). On June 3, 2015, he filed an amended complaint.[6] (Doc. #7). In his amended complaint, Anderson alleges that he "suffered a retaliatory transfer at the hands of the defendants for exercising his protected rights under the First Amendment to file administrative remedies against prison officials." (*Id.* at 3). Specifically, Anderson alleges that:

> On or before January 2014, the defendants Moody, Burnett, and McClatchey conspired to retaliate against the plaintiff which resulted in a retaliatory transfer. Defendant Moody is personally involved since she requested and initiated the transfer. Defendant Burnett is personally involved because he drafted and falsified the transfer request form. Defendant McClatchey is personally involved because he made many comments to the plaintiff about his displeasure with the plaintiff filing administrative remedies against him and Moody. Defendant True is personally involved since he signed and approved the retaliatory transfer and was aware of the retaliation.

(*Id.*).

  Elsewhere in his complaint, Anderson alleges that he would not have been transferred to FCI Danbury but for the fact that he filed grievances against prison staff. (*Id.* at 6). He claims that he did not meet the criteria for transfer to FCI Danbury because he lacked experience in mechanical services and did not have a release residence close to that institution, and that Burnett

---

[6] Anderson has since made clear that he did not intend to submit an amended complaint, but rather merely to submit additional service copies of his original complaint. (Doc. #8). In any case, the numbered "Complaint" sections of Anderson's filings, which set forth the substance of his allegations, are identical in the complaint (Doc. #1) and amended complaint (Doc. #7). For convenience, the Court will refer to the amended complaint (Doc. #7).

6

provided false information on the Request for Transfer form in order to effectuate the transfer. (*Id.* at 12-13). Anderson considers the placement at Danbury less favorable than Milan because it is farther from his release residence of Wisconsin and allegedly too far away for family to visit. (*Id.* at 6). Anderson also views Danbury as inferior to Milan because it does not offer ceramics and other classes that enable him "to cope with the stress of being incarcerated." (*Id.*). He seeks $250,000 in compensatory damages from each defendant for mental and emotional distress, punitive damages in the amount of $500,000 from each defendant, and attorney's fees and costs. (*Id.* at 3-4). Defendants now move for summary judgment as to all of Anderson's claims.

**B.     Standard of Review**

Federal Rule of Civil Procedure 56 provides: "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts

7

showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989)). Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id*. (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id*. at 560 (citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

**C.    Analysis**

Defendants argue that summary judgment in their favor is warranted on qualified immunity grounds.[7] (Doc. #46 at 28-32). Specifically, Defendants argue that they are entitled to qualified immunity because at the time of the allegedly unlawful conduct, it was not "clearly established" that a transfer such as Anderson's was an "adverse action" within the meaning of the relevant First Amendment jurisprudence. (*Id.*). As set forth in greater detail below, the Court finds merit to this argument.

       *1.     General Legal Standards*

Under the doctrine of qualified immunity, governmental officials performing

---

[7] Defendants also argue that summary judgment is appropriate for several other reasons, including, *inter alia,* that Anderson did not engage in activity protected by the First Amendment and that Defendants would have taken the same action even in the absence of Anderson's filing of administrative grievances. Because the Court finds that qualified immunity shields Defendants from liability, however, it need not address the merits of these other arguments. Thus, for purposes of the analysis that follows, the Court will assume that Anderson's grievance with respect to Moody constitutes protected speech.

8

discretionary functions are shielded from civil liability unless their conduct violates a clearly established constitutional right. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Claims of qualified immunity are analyzed on a "fact-specific, case-by-case basis to determine whether a reasonable official in the defendant's position could have believed that his conduct was lawful, judged from the perspective of the reasonable official on the scene." *Cochran v. Gilliam*, 656 F.3d 300, 306 (6th Cir. 2011). Once the defense of qualified immunity is raised, the plaintiff bears the burden of showing that the defendants are not entitled to immunity. *See Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005).

Determining the applicability of qualified immunity requires a two-step inquiry into whether the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). *See also Beaton v. City of Allen Park*, 2015 WL 3604951, at *10 (E.D. Mich. Jun. 8, 2015) ("Thus, to defeat [defendant's] assertion of qualified immunity, 'Plaintiff must show both that, viewing the evidence in the light most favorable to [him], a constitutional right was violated and that the right was clearly established at the time of the violation.'") (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)). In conducting this inquiry, the court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. In determining whether a clearly established

9

constitutional right was violated, courts "do not assess the right violated at a high level of generality, but, instead, [courts] must determine whether the right was clearly established in a more particularized … sense …." *Myers v. Potter*, 422 F.3d 347, 356 (6th Cir. 2005) (internal citations omitted). The Court must carefully define the right allegedly violated because:

> [i]f the right is defined too narrowly based on the exact factual scenario presented, government actors will invariably receive qualified immunity. If ... the right is defined too broadly, the entire second prong of qualified immunity analysis will be subsumed by the first and immunity will be available rarely, if ever…Our definition must be "particularized" in the sense that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of preexisting law the unlawfulness must be apparent.

*Beaton*, 2015 WL 3604951, at *11 (quoting *Golodner v. Berliner*, 770 F.3d 196, 206 (2d Cir. 2014) (internal citations, quotation marks, brackets, and explanatory parentheticals omitted)). "Therefore, in a First Amendment retaliation case like this one, 'the right in question is not the general right to be free from retaliation for one's speech.'" *Beaton*, 2015 WL 3604951, at *11 (citation omitted). "Rather, the right in question is whether [the defendants] had 'fair warning' that the actions [they] took against Plaintiff in the present case were unlawful under the First Amendment, or, phrased differently, whether the purported unlawfulness of [defendants'] actions was 'apparent' to [them] at the time [they] took them." *Id.* (quoting *Golodner*, 770 F.3d at 206 (internal citations omitted)).

### 2. Anderson's Retaliation Claim is Barred by Qualified Immunity

Under Sixth Circuit law, to establish a claim for First Amendment retaliation, the plaintiff must show that: (1) he engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between the protected conduct and the adverse action – that

is, the adverse action was motivated at least in part by the plaintiff's protected conduct. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Taking the above principles into account, the salient question is whether it was clearly established at the time of Anderson's transfer that it was unlawful to transfer him between two prisons of the same security classification for having engaged in protected speech.[8] Defendants argue that they are entitled to qualified immunity "because at the time of the allegedly unlawful conduct it was not 'clearly established' that a transfer such as [Anderson's] was an 'adverse action' within the meaning of the relevant First Amendment jurisprudence." (Doc. #46 at 28). Specifically, Defendants assert that there are a "litany of cases" standing for the proposition that a transfer to another prison of the same security level is not an "adverse action." (*Id.* at 30 (citing cases)). Based on a review of the relevant case law, the Court agrees.

In general, a prisoner has no protected right to remain incarcerated at a particular institution. *See, e.g., Hix v. Tenn. Dep't of Corr.*, 196 F. App'x 350, 358 (6th Cir. 2006); *Ward v. Dyke,* 58 F.3d 271, 274 (6th Cir. 1995). And, courts have held that, "As a general matter, a prison official's decision to transfer a prisoner from the general population of one prison to the general population of another is not considered adverse." *LaFountain v. Harry*, 716 F.3d 944, 948 (6th Cir. 2013). "Since prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a person of ordinary firmness from continuing to engage in protected conduct." *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005). Numerous other cases in this Circuit have reached the same conclusion: generally speaking, a transfer from one prison to another of the same security level is not an adverse action. *See e.g., Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010) (barring

---

[8] As noted above, *supra* n. 7, the Court assumes, for purposes of this analysis only, that Anderson's grievance with respect to Moody constitutes protected speech.

11

certain "aggravating factors," transferring a prisoner from one prison to another of the same security level is not an adverse action); *Smith v. Yarrow*, 78 F. App'x 529, 542 (6th Cir. 2003) ("transfer from one prison to another prison cannot rise to the level of an adverse action because it would not deter a person of ordinary firmness from the exercise of his First Amendment rights") (internal quotation marks omitted); *Friedmann v. Corr. Corp. of Am.*, 2001 WL 467990, at *4 (6th Cir. Apr. 26, 2001) ("[A] mere transfer to another institution of the same security level, with no other aggravating factors, is not sufficiently adverse to deter a person of ordinary firmness from engaging in the exercise of protected First Amendment activity."); *Dye v. DeAngelo*, 2010 WL 4982925, at *5 (E.D. Mich. Nov. 4, 2010) (no violation of clearly established right even if defendants did have retaliatory motive because transfer to prison of same security level not adverse action).

In the face of this case law, Anderson points to cases in the Sixth Circuit finding that a transfer between prisons could, under some circumstances, deter a person of ordinary firmness from engaging in protected conduct and, therefore, be considered an adverse action. (Doc. #61 at 14-18). For example, Anderson first cites *Siggers-El*, *supra*, in which the Sixth Circuit found that there were circumstances in which a transfer could constitute an adverse action for purposes of a First Amendment retaliation claim. In that case, however, the Court specifically reached this conclusion because the plaintiff:

> … was not only transferred, but also suffered a number of foreseeable consequences that inhibited the Plaintiff's ability to access the courts. As a result of the transfer, the Plaintiff not only lost his high paying job that he needed in order to pay his attorney, but the transfer also made it more difficult for his attorney to visit with or represent him because he was moved further away from her.

*Siggers-El*, 412 F.3d at 702. In this case, however, Anderson concedes that he "does not claim to have lost a high paying job that he used to pay his attorney nor does [he] claim to now have

12

'limited access' to his attorney …." (Doc. #61 at 14). As such, Anderson's reliance on *Siggers-El* is misplaced.

In *Pasley v. Conley*, 345 F. App'x 981, 985 (6th Cir. 2009), an unpublished case cited by Anderson,[9] the Sixth Circuit held that a transfer to another prison of the same security level could constitute an adverse action where it was done "to have [the plaintiff] moved out of the unit so that he would lose his job" and "to have him moved to a location where his family would not be able to visit him." Anderson asserts that, as in *Pasley*, there were certain "foreseeable negative consequences" in his case that resulted from his transfer to FCI Danbury. (Doc. #61 at 14). Specifically Anderson asserts that (1) FCI Danbury is "less desirable" than FCI Milan because "it was converted from a female prison and offers no meaniful [sic] programs"; (2) he was transferred "well beyond the traveling distance of family and no longer receive[s] visits"; (3) FCI Danbury does not offer the ceramics course that allowed him to "cope with stress"; and (4) he lost his job in the psychology department, which allowed him to help suicidal and mentally challenged inmates. (*Id.* at 15).[10]

It is true that *Pasley* – an unpublished case – holds that, under certain circumstances, a transfer resulting in the loss of visitation can be considered an adverse action. At the time of the events in question in this case, however, there was at least one other unpublished Sixth Circuit case holding just the opposite. Specifically, in *Friedmann*, the Court stated:

---

[9] Anderson also relies on *Hunter v. Rapelje*, 2015 WL 2124750 (E.D. Mich. Mar. 23, 2015), *report and recommendation adopted in part and rejected in part*, 2015 WL 2124754 (E.D. Mich. May 6, 2015). (Doc. #61 at 15). That case, which was decided in 2015, does not inform the analysis of what was "clearly established" at the time of Anderson's transfer to FCI Danbury in 2014.

[10] Anderson also asserts that he now "suffers anxiety for fear of being retaliated against again by BOP officials." (Doc. #61 at 15). Such an assertion, however, goes more toward the injury allegedly suffered by Anderson as a result of the transfer, not to the issue of whether the transfer itself constituted an adverse action under the law.

13

> In this case, Friedmann makes no allegation of any aggravating circumstances in connection with his transfer to the NCC. **He simply claims that the institution was located farther away from those who visited him and that the institution did not offer the programs in which he had previously participated. This Court concludes that such circumstances are not sufficient to support a showing of "adverse action" for purposes of a retaliation claim.** In other words, this Court concludes that, in the absence of any aggravating circumstances, the Court cannot conclude that Friedmann's transfer to NCC would deter a person of ordinary firmness from the exercise of his First Amendment rights.

*Friedmann*, 2001 WL 467990, at *4 (emphasis added).[11]

Courts have recognized that the burden of establishing that the law was "clearly established" rests squarely with the plaintiff. *See Perez v. Oakland County*, 466 F.3d 416, 427 (6th Cir. 2006). "A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred." *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009) (internal quotations omitted). Applying these principles, in this case, it would not have been apparent to a diligent officer consulting relevant case law that a lateral transfer motivated by the filing of grievances – even one that resulted in the loss of visitors – would necessarily be unlawful. Consulting the published case law, the officer would find *Siggers-El*, which does not address the visitation question, focusing instead on an inmate's

---

[11] At the time of the events in question, several District Courts in Michigan had also reached the same conclusion under similar circumstances. *See, e.g., Dye*, 2010 WL 4982925, at *5; *Thompson v. Mich. Dep't of Corr.*, 2012 WL 6096575, at *6 (W.D. Mich. Dec. 7, 2012) (transfer to a different prison, which resulted in being placed in a lower paying job, not an adverse action); *Porter v. Howard*, 2012 WL 3263789, at *4-5 (E.D. Mich. Jan. 6, 2012) (rejecting plaintiff's argument that transfer from prison in Detroit to facility in Kincheloe, Michigan, constituted an adverse action "because Kincheloe is 'up north' in Michigan's upper peninsula and is 'away from [his] family'" and holding that plaintiff had "only alleged negatives that are ordinarily associated with a transfer, i.e., moving to a different location that may be more inconvenient for visitors"); *Catanzaro v. Mich. Dept. of Corrections*, 2009 WL 735073, at *17 (W.D. Mich. Mar. 12, 2009) ("Plaintiff's transfer was from one level I facility to another level I facility. Plaintiff has no constitutional right to remain at a specific facility or to prevent a transfer to another level I facility.") (citing *Ward*, 58 F.3d at 274).

access to the courts (which Anderson concedes was not an issue for him here). Moving to unpublished case law, the officer would find cases going both ways. As Defendants point out, in such situations – where there is at least arguably case law going both ways – the officers are entitled to qualified immunity because mixed case law indicates that the right was not sufficiently "clearly established" for the plaintiff to sustain his burden of overcoming the defense. (Doc. #64 at 3 (citing *Wilson v. Layne*, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.")).

For all of these reasons, the Court finds that it would not have been clear to a reasonable officer, at the time of the events in question, that transferring Anderson to FCI Danbury – an institution of the same security level as FCI Milan – was an adverse action. As such, Defendants are entitled to qualified immunity on Anderson's claim of retaliatory transfer, and their summary judgment motion should be granted. *See Griffin v. Berghuis*, 563 F. App'x 411, 420 (6th Cir. 2014) (granting summary judgment in favor of defendants on qualified immunity grounds where "the indeterminacy of pertinent authority on the issue means that neither [defendant] reasonably could be expected to know that [the plaintiff's] transfer was sufficiently adverse to support a First Amendment retaliation claim").

### III. CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment [**46**] be **GRANTED**.

Dated: November 30, 2016       s/ David R. Grand
                               DAVID R. GRAND
                               UNITED STATES MAGISTRATE JUDGE

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 30, 2016.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
